UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
ROBERT ROLLAND,                  :
                                 :
            Petitioner,          :      **REPORT AND RECOMMENDATION**
                                 :
        -against-                :      02 Civ. 8403 (GBD)(MHD)
                                 :
CHARLES GREINER, Superintendent, :
Green Haven Correctional         :
Facility,                        :
                                 :
            Respondent.          :
--------------------------------x


**TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:**


Petitioner Robert Rolland seeks a writ of habeas corpus challenging his 1999 conviction in New York State Supreme Court, New York County, on one count of Murder in the Second Degree. The court sentenced Rolland to a prison term of twenty-five years to life, and he is currently incarcerated pursuant to that sentence.


In his habeas petition, Rolland advances two grounds for relief. First, he asserts that the trial court denied him his due-process right to present a defense when it refused to admit a confession by another individual, named Anthony Moore, as a declaration against penal interest. He also requests a hearing to determine the reliability of Moore's statement. (See Petr's Reply Memo). Second, he claims that the trial court denied him his right to confrontation when it admitted brief police testimony that an unavailable witness named Curtis Gibson had admitted his own

participation in the crime and had identified petitioner as one of the perpetrators. (See Habeas Petition filed October 22, 2002 ("Pet.") at ¶ 12; Petr's Memo at 32-57). Respondent maintains that Rolland's claims are meritless. (See Respondent's Memorandum of Law ("Resp. Memo") at 30-66).

At first blush, the outcome in state court -- allowing the admission of a portion of a confession by one suspect who implicated petitioner and precluding the admission of a confession by another suspect who effectively exculpated petitioner -- may seem surprising. Nonetheless, that result in this case is in harmony both with state evidentiary rules and with constitutional requirements. For the reasons that follow, therefore, we recommend that the writ and the request for a hearing be denied and the petition dismissed with prejudice.

## I. Background

On November 19, 1992, three men committed an armed robbery at a Radio Shack store in lower Manhattan. James O'Sullivan, a retired police sergeant who was shopping in the store, attempted to intervene, but was shot by two of the robbers and died that evening. Rolland and his two co-defendants, James Davis and Curtis Gibson -- all of whom confessed to the crime -- were arrested more

than five years later, in January 1998.

Long before these arrests, in January 1993, Anthony Moore, who was in custody on an unrelated robbery charge, told the police that he had been the "lookout" for that Radio Shack robbery, and that the other participants had been Jonathan Jones, Brett Faranoy, and Marvin Brown. Several eyewitnesses later identified Brown as a participant in the crime. Based on Moore's statements, he and Brown were indicted, and in February 1996 Moore was convicted of second-degree murder for his asserted role in the robbery. Once Rolland, Davis, and Gibson were arrested in 1998, however, the District Attorney dropped the pending charges against Brown and consented to the vacatur of Moore's conviction. (See Petr's Brief at 2; Resp's Brief at 1-3).

At Rolland's trial, the prosecutor introduced written and oral inculpatory statements that Rolland had made while in custody but prior to his arrest on the Radio Shack charges. In responding to these statements, defense counsel argued, and Rolland testified, that Rolland's admissions included certain details that "did not come from Rolland" (221), but rather from police detectives who had been familiar with the investigation and who had coerced Rolland's confession by threatening to transfer him to a more restrictive facility and to prevent his appearance before the parole board if

he did not cooperate.

The prosecutor at Rolland's trial also introduced police testimony that Rolland's colleague Gibson had inculpated himself and in the process had named Rolland and Davis as his accomplices. (423). Petitioner unsuccessfully objected that the reference to this out-of-court statement violated his right of confrontation.

As part of Rolland's defense, he sought to introduce Moore's 1993 out-of-court declaration that Brown, Jones, and Flournoy had committed the crime. The prosecutor objected, and the court granted the State's in limine motion to preclude the use of Moore's statement as inadmissible hearsay. Rolland claims that his due-process rights were violated when the court excluded Moore's confession. (See Petr's Brief at 2-3; Resp's Brief at 3).

## II. The Trial

### A.   The State's Case

#### 1. Witness Testimony

Ahmed Zoughy, the manager of a Radio Shack outlet located at 9 Broadway in Lower Manhattan, testified at trial that he and two

salesmen, Philston Angol and Jose Torruella, had been scheduled to work until 6:00 p.m. on November 19, 1992. (297-99). At around 5:45 p.m., Zoughy noticed a customer looking at remote-controlled race cars. (300). Zoughy asked the customer if he could help him, and the man -- later identified from fingerprints as James Davis -- stated that he was looking for a toy for his daughter. (300-01).

A few minutes later, another man entered the store, carrying a bag on his left shoulder. (302). Zoughy greeted this man -- later identified as Gibson -- who told him that he was just browsing. Gibson walked to a television display at the rear of the store. (303). Zoughy noted that Gibson did not make eye with him but made eye contact with Davis. (302-03).

Shortly thereafter, James O'Sullivan, a retired New York police sergeant, came into the store. (303-04). Zoughy told O'Sullivan that he would assist him as soon as he had finished with the other customers, and O'Sullivan browsed near the check-out counter. (304-05). At that point, Zoughy announced to the customers that the store was about to close. (305). He recalled that Torruella was helping a young white man, John Bostany (306), and that Angol was helping still another person fill out an application, but Zoughy did not get a good look at that man's face. (306).

At that point, Gibson went behind a display case and came out pointing a "machine gun" at Zoughy, and the two men then started struggling. (306-08). As Zoughy maneuvered the gun under his arm, it went off. (307). Gibson reached to his waist and pulled out another gun, apparently trying to shoot Zoughy in the face, but in the struggle he ended up shooting at the ceiling. (307). Zoughy then saw Davis pull out a gun. (307). At about the same time, O'Sullivan drew a gun, saying "I'm an officer", and exchanged fire with Davis. (308-09). O'Sullivan was apparently hit, and he fell at the entrance to the shop. (309).

Gibson and Davis then forced Zoughy and Torruella to the counter, where Zoughy gave them $1,400.00. (310, 312). Davis then said "Let's go", and he and Gibson left the store. (310). Zoughy started to walk towards the prone O'Sullivan when the third robber -- assertedly Rolland -- shot Sullivan one more time as he lay on the floor and then exited the premises. (310).

Zoughy stated that he never got a good look at the third robber's face, but described him as a heavy-set black man. (311). Shortly after the robbery, he was shown photographs by the police, and he selected a picture of someone who looked like the second man to shoot O'Sullivan; in 1993, he picked out a different person in a lineup as the second man to shoot O'Sullivan. (312). At the

trial, he stated that he could not recall the face of the third robber. (313).

Angol testified that, at the time of the robbery, he was helping a customer who seemed interested in purchasing a stereo system. (532-33). Although at trial he could not remember the face of that customer, Angol described him as black, heavy set, "most likely over 200 pounds," and a little shorter than six feet tall. (533). He described the customer whom Zoughy was helping as "slender," and taller than he was (six feet) (535-36), and he recounted that the man had a bag and "looked a little suspicious." (537).

According to Angol, the man with the bag suddenly took a large gun from his bag. (537). Frightened, Angol ran towards the exit, but was prevented from leaving by another man, who extended his arm. (537-38). Angol then turned around and headed back to the office area, reached the back room and closed the door behind him. (539-40). He remained there for five minutes and heard a number of gunshots. (540-41).

John Bostany, a customer in the Radio Shack at the time, testified that all of a sudden there was a "commotion". (666). He saw one of the salesmen "charging toward the commotion," as another

man pulled a gun on him and told him to step away from the counter. (666-67). He heard very fast footsteps behind him, and heard a gun go off. (667). He then saw a middle-aged white man heading toward the altercation with a gun drawn. (667-68). Someone said "get down," and he lay prone on the ground, face down, and heard a lot of gunfire. (668). Once the gunfire stopped, he began to get up, but then he heard more gunfire and got back on the ground and waited. (668-69). Finally, he heard salesmen say that the coast was clear. (669). Several months later, having viewed several lineups, he "thought he recognized somebody in one lineup" as the person who had pointed a gun at him, but Rolland was not in that lineup. (671-72).

Police Officer Mark Colamesto was standing across the street from the Radio Shack store when he heard what sounded like gunshots. (643). As he headed to the store, he saw a stocky, six-foot-tall black man –- whom he identified at trial as Rolland –- run out of Radio Shack. (643). He attempted to catch up with the fugitive, but the man opened the driver's side door of a car parked at the corner. When Colamesto told the man to shut off the engine and get out, the suspect looked at him, "dropped the stick shift into drive," turned the wheel and accelerated, causing Colamesto to jump out of the way. (644-46).

Colamesto returned to Radio Shack and saw O'Sullivan lying on the ground with a gun in his right hand and a gold sergeant's shield in his left hand. (646-48). Colamesto subsequently viewed four different line-ups and selected four different people as the driver, none of whom was Rolland. (649).

Officer Henry Fieldsa testified that he had recovered bullets at the crime scene and observed damage from the shots fired in the store. (72-73, 76, 85, 91-92). The store manager told him that one of the robbers had touched a remote-controlled race car, and he therefore dusted it, as well as other areas of the store, for fingerprints, and recovered two latent fingerprints from the toy car. (77-78, 92-93).

Detective James Turnbull testified that in November 1992 he had driven Zoughy to a Brooklyn police station to review photographs of people who had committed similar crimes. (433, 449, 460). Zoughy chose two photographs. (461). One of the men he selected was in jail at the time. (434, 462). Turnbull gave the name of the other man to the police, but he was not considered a suspect. (462-63). Neither of these men, nor a person whom Zoughy later identified during a lineup, was Rolland. (434, 467). Turnbull also noted that Angol had looked at photographs and viewed a lineup, but had been unable to identify anyone. (480-81).

More than four years later, as a result of a letter that the District Attorney's Office had received in February 1997, which provided new details about the Radio Shack crime, Turnbull was again assigned to the case. (416). He interviewed the person who had sent the letter (unnamed at trial), who stated that the source of his information was Curtis Gibson. (417)[1].

Defense counsel repeatedly objected to this line of questioning, but the court overruled the objections, noting that counsel had a "standing objection" on this issue. (417).[2] Turnbull stated that, as a result of the information he had gleaned, he went to St. John's Hospital in Brooklyn to see whether it had any medical records reflecting treatment of Gibson on November 19, 1992, the date of the robbery. Those records, which apparently indicated treatment of Gibson for a gunshot wound, were received in

---

[1] The author of the letter was not disclosed to the jury, but, according to the prosecutor, was Gibson's cellmate, Michael Williams, who had written to the District Attorney's Office in February 1997, reporting that Gibson had told him about the Radio Shack shooting. (H 180-81, Pet's Appendix ("A") 48). The State wired Williams, and on tape Gibson named Davis and Rolland as his accomplices in the Radio Shack robbery and shooting. (H 181-83, A 49). After listening to the tape, the police interviewed Gibson and Davis, and both confessed to the crime, inculpating each other and Rolland. (H 182-83, A 49-50).

[2] The court had earlier ruled in favor of the admissibility of Gibson's confession for the limited purpose of rebutting defense counsel's contention to the jury at voir dire that the police had conspired to frame Rolland. We summarize the proceedings that led to that ruling, at pp. 22-29, infra.

evidence. (417-18, 422).

Turnbull also testified that as a result of receiving the letter, the police interviewed Gibson, who admitted his role in the robbery and identified James Davis and Robert Rolland as participants. (423). Turnbull then provided those names to the Latent Fingerprint Unit, which had not yet identified the latent fingerprints on the toy car at Radio Shack that one of the robbers had touched during the robbery. (423). On October 28, 1997, Detective Daniel Perruzza of the Latent Fingerprint Unit determined that the fingerprints were those of Davis. (381-87, 389).

On October 31, 1997 Hayes and Petrak met with Rolland at a correctional facility. (559). Although he gave them a non-inculpatory statement concerning Gibson's gunshot wound, that fact was not disclosed at trial until the State's rebuttal case, when the judge allowed the statement to be read as a prior inconsistent statement. (879, 881, 1026, 1028). (See p. 33, infra).[3]

On November 5, 1997, Petrak interviewed Davis and showed him Rolland's photograph. (688-89). Apparently based on a statement by

---

[3] The statement was not disclosed on the State's main case based on the trial court's prior ruling that it was tainted by the failure of the police to give Rolland Miranda warnings. See People v. Rolland, 180 Misc.2d 729, 733-34, 93 N.Y.S.2d 803, 806-07 (Sup. Ct. N.Y. Cty. 1999).

Davis, Lt. Roger Parrino, who was supervising the Radio Shack investigation, decided that Detectives Hayes and Petrak would re-interview Rolland on November 7. (424)[4]. The plan was that Hayes and Petrak would first enter the correctional facility and determine whether Rolland would speak with them. (513). Those two officers would then question Rolland about Gibson's injury from November 19, 1992. (424-25, 513-14).

Hayes testified that he and Petrak met with Rolland on November 7, 1997, and that Petrak gave Rolland <u>Miranda</u> warnings from a printed card. (562). According to Hayes, Rolland initialed the card, and below his signature at the bottom of the card he wrote "I was not promised nothing about any deal for time or nothing." (565). Hayes recounted that he and Petrak asked Rolland what he knew about the circumstances of Gibson being shot in November 1992 (566), and that Rolland replied that Gibson had been wounded at a Brooklyn Housing Project during a drive-by shooting, and that he had taken Gibson in a cab to the hospital. (566). Petrak then showed Rolland a number of photographs, from which Rolland identified two people, Curtis Gibson and James Davis. (567). Hayes asked Rolland whether he knew what Davis did for a

_____

[4] Hayes testified that, before the interview, he was aware that there were medical records indicating that Gibson had been shot on November 19, 1992, but he had not met any of the witnesses present at the scene of the crime and had not read any reports from the crime. (557-58).

living, and Rolland responded that he did robberies. (567-68).
Petitioner smiled when Hayes asked him whether he ever did
robberies with Davis. (568).

After a lunch break, the two officers resumed their interview
with Rolland. Hayes explained to Rolland that because there were
inconsistencies in the details of Gibson's injuries, they wanted to
re-interview him. (568-69). Petrak placed three photographs on the
table: one of the Radio Shack premises, one of Davis and one of
Gibson. (570). Hayes told Rolland to be truthful and then asked him
whether he knew that the man who had been shot in the store had
been a police officer. (570). Hayes reported that Rolland stared at
the photographs, said that he did not know that, and began to cry.
(570). They then asked him if he would give a statement, and
Rolland agreed to do so. (570-71). They gave him a pad, and he took
twenty to twenty-five minutes to write out a statement. (571-72).
The statement was received into evidence over objection (573), and
Hayes read it into the record:

> I, Robert Rolland, and James Davis and Curtis Gibson went
> out on a robbery which James Davis set up that was by his
> job. We went into the place and look around. Butch
> yelled, 'This is a stick-up.' That when the manager
> couldn't give him the money -- wouldn't give him the
> money to the cash register, but then the manager run away
> from the money register and that when a man started
> firing his gun at us. So I ran out to the door with
> Davis, and Butch was last to get to the door. That when
> he got shot in the shoulder. Then he fired back at the
> man who never said he was a cop or anything. I ran to the
> train station and then later meet Butch who was shot in

>the arm by the man, but manager never would give us the
>money.

(575). Hayes and Petrak then asked Rolland to speak with Detective
Turnbull, and he agreed. (576). Hayes went to get Turnbull, and
then he and Petrak left the room, leaving Turnbull with Rolland.
(576-77).

Turnbull's conversation with Rolland was recorded on hidden
audio recording equipment. (429-30, 440-41). Turnbull first asked
Rolland whether Hayes and Petrak had advised him of his <u>Miranda</u>
rights, and Rolland responded in the affirmative. Turnbull told
Rolland that he wanted to ask him some questions about his
statement. In responding to Turnbull's questions, petitioner stated
that there had been three participants in the crime; that he had
been armed with a .380 automatic pistol; that "Butch" (Gibson) had
had a .38, and that Davis had carried a Tech Nine.[5] As described by
Rolland, once the robbery was underway, Butch forced everyone in
the store into a corner, but the manager "started tussling" and ran
away from the cash register, and another man started firing at
them. Rolland stated that he had run out of the store with Davis,
and that Butch followed them after he had fired at the man with the
gun. After the robbery, Rolland drove back to Brooklyn alone and

---

[5] Rolland's recorded statement does not appear in the
transcript, but both sides agree as to the substance of what was
on the tape. (Pet's Memo at 17; Resp Memo at 17-18).

found Davis and Butch five to ten minutes later. He related that he and Gibson had both been shot, but that he took the bullet out of his own arm with a knife. He said that he had given the car to some "Latin guys" to strip and that he had sold his gun.

Following this interview, Turnbull left the room and told Hayes that Rolland was "not telling the whole truth." (578). Hayes and Petrak returned to question Rolland further. Petrak told Rolland that they knew what had happened and that he had not told them everything in his previous statement. (700). Hayes asked who had shot O'Sullivan, and Rolland responded, "[i]t was my gun that killed the man." (579, 701-02). After waiting a few more minutes, they requested that Rolland prepare another written statement, and he agreed. (579, 700-02). The text of this statement is as follows:

> Davis worked downtown Manhattan. He told me and Butch about he had a robbery for us to do, the day before. We then come to his job and we went to Radio Stack [sic.]. I told Davis it is no money in this place. That when Butch say, "This is a stick-up." That when I put everybody on the wall.
> Butch could not control the manager and he ran away from him. That when I grab the manager and told him, "This is not your money," then face back and said to Davis, "Watch the people on the wall." So the manager ran out and started -- yelled to the back of the store between a door. That when I heard a gunshot and Butch and Davis was running toward the door and Davis shot Butch in the shoulder.
> The man was at the door and he fired shot at me. One hit me in the arm and one missing me. I fired back at him more than two times and ran out the door into the street and got into the car which I saw a policeman in the street. I went by him and hit a car and entered the Man[hattan] Bridge and seen Curtis and Davis at Third

Avenue.

  Later because I was looking for them and Butch want to go to the hospital, but I told him he just be crazy. That when I went upstairs and took the bullet out of me. No, no, [sic.] was up, the next day at night I took the car uptown Bushwick area, then burn it with gas.

  I gave a untrue statement before this but this is the trust [sic.].

(584-85).

Detective Ferrari testified that he had asked Rolland about the car and gun used in the crime. According to Ferrari, Rolland gave a written statement in which he reported that he had obtained the car from "a man named Joseph who steals cars for anybody," and that he had bought the .38 pistol in Brooklyn from a black male whom he did not know. (734-38).

Later that day, Detectives Ferrari and Petrak, both wearing hidden recording devices, returned to speak with Rolland. (738, 703-04, 709). Rolland narrated the events of the crime one more time, and the audio tape was entered into evidence. (703-05). At approximately 6:00 p.m., the detectives informed Corrections Officer Gary Allen that Rolland had been "involved in another crime." (264). After Rolland was handcuffed and taken to a more secure area of the prison, Allen testified, he became "a little bit emotional and started crying," stating that he was in "serious trouble. He made a mistake, got caught." (265-66).

On January 5, 1998, Hayes arrested Rolland, Gibson, and Davis for the Radio Shack robbery. (588). At that time, Rolland weighed 220 pounds, and he stood five feet, ten inches tall. (588). Turnbull did not arrange any lineups because Zoughy, Bostany, Angol, Torruella and a woman who had been in the store all indicated that they could not identify any of the robbery participants so long after the crime. (433, 439, 467-69, 478, 481, 483-84).

2. <u>The Testimony About Gibson's Statement</u>

During <u>voir</u> <u>dire</u>, defense counsel referred, in the presence of the jury, to his trial strategy, which was to impugn the credibility of the police officers. Counsel stated, for example, that "whatever these officers say is just not true" (VD 129); that the officers were "liars" (VD 129-30); and that they had "made up a story" that they later asserted came from Rolland. (VD 132, 213; A 18).[6]

With regard to the question of "why it took [the police] five

---

[6] The parties did not provide the full text of the <u>voir</u> <u>dire</u> proceedings, although petitioner provided selected pages in his appendix. (A 13-30). The court sought the transcript, but it has not been forthcoming. In any event, neither counsel contested the summary of <u>voir</u> <u>dire</u> proceedings provided by his adversary, nor did they contend that the quotes from the proceedings were inexact.

years to reach this defendant [Rolland]," defense counsel asked the court to rule on "how far, if any, distance the People can go with the interviews with Curtis Gibson and any statements Curtis Gibson may have said to them." (VD 230, A 11). The court deferred a decision on the admissibility of Gibson's statements until the end of jury selection, during which time defense counsel continued to argue that the police had manufactured Rolland's confession. (VD 450-51, A 16-17).

After jury selection concluded, the prosecutor argued that because defense counsel had insisted that the police had conspired against the petitioner, the jury should be allowed to hear "the background" as to why the police had gone to see Rolland in prison, including a reference to Gibson's identification of Rolland as a participant in the robbery. The prosecutor added the caveats that the information should not be provided in great detail and that the court should give an instruction that any statements received by the police on which they relied in this respect were not offered for their truth. (A 33-34).

The trial court suggested that the prosecutor might state that, "pursuant to information developed from one of the other codefendants as a source the detectives went up [to the correctional facility] to question the defendant". (A 35). Defense

counsel responded, "It is my position that the district attorney is allowed to bring in the fact that police officers spoke to Gibson, Gibson turned him onto [Rolland]." (Id.). The colloquy then went as follows:

> THE COURT: I would permit the People to say that based on statements of co-defendant Gibson implicating the defendant in the robbery the detectives visited the defendant at the Washington Correctional Institute.
>
> DEFENSE COUNSEL: I think that opens the door up for me to do whatever I want as to whether that's a credible statement by Gibson.
>
> THE COURT: I don't think so because we are not dealing with credibility here.
>
> DEFENSE COUNSEL: I'm saying, if Gibson said Rolland had something to do with it you're asking the jury to believe that what Gibson said is true?
>
> THE COURT: No, I'm not at all.
>
> PROSECUTOR: I would ask for [a] charge that says it does not go to the truth for why they went.
>
> DEFENSE COUNSEL: That also opens the door for me to bring out prior history of this case intervening. Another person was arrested, two other people were arrested and the case was substantially closed at that point then suddenly Gibson comes into the picture five years later . . . why five years later this defendant was arrested. . . . [The jury] should know the whole history of the case with the instruction the Court wants to give them. To show continuity of the case that another person was picked out of lineups as a participant, Mr. Brown, it opens the door to all of this.
>
> THE COURT: I don't think it does, quite frankly. I would be against such a theory.

(A 36a-37).

The next day, the court held that the prosecutor could introduce testimony that the detectives had visited Rolland because Gibson had made statements "inculpating the defendant." (172-73, A 39-40). Defense counsel asked, "What scope of cross-examination does that permit me?" (173, A 40). The court answered that "it's not for the truth thereof; therefore you can't go into the truth." (Id.) Thinking out loud, counsel mused whether he would "bring out the entire statement to somehow indicate the statement is totally unreliable as a basis even . . . I may not want to [examine the reliability]." (174, A 41). The prosecutor asserted that if defense counsel inquired into the reliability of the statement, he would move to introduce "not only the statement that Gibson made but the entire taped conversation where they wired this informant [Gibson's cellmate] and spoke to the defendant. . ." (175, A 42). The prosecutor added that since defense counsel had challenged the conduct of the police and asserted that they had conspired against Rolland, he did not "see how the jury would be not entitled to know, at least, why [the detectives] went [to talk to Rolland], and if that is challenged . . . then I think the jury should know what it was they had before they went there." (178, A 45).

The court agreed, and defense counsel then inquired whether the court would give a limiting instruction concerning the permissible use of such testimony. (179, A 46). The judge stated

that he would instruct the jurors not to consider that statement "as any evidence in chief on the issue of the defendant's guilt, but only as reflected in the state of mind of the police officers and in explaining their actions in visiting the defendant." (Id.). The prosecutor reprised the history of how the police had been led to Gibson and then to Rolland (180-84, A 47-51), and he represented that he was prepared simply to leave it at Gibson inculpating Rolland and to say only that the police had then interviewed Davis and subsequently interviewed Rolland. "I'm not trying to come up with defenses but the defense could be, yes, the police were justified to go up and see him. What they did after that was not justifiable." (190, A 57). The court advised defense counsel that "in view of the voir dire," its suggestion was "a very limited remedy that you place the prosecution in, which is, a response to your statements concerning a conspiracy to fram[e] your client." (191, A 58).

Based on the court's ruling, as indicated above, Detective Turnbull testified -- over Rolland's objection -- that he had learned in late 1997 that the District Attorney's office had received a letter providing information about the Radio Shack crime, and that Gibson was the ultimate source of the information; and that he had interviewed Gibson, who inculpated petitioner and Davis. (416-17, 423). Detective Hayes later confirmed his presence

when Gibson inculpated Rolland. (557). At the time of this testimony, the court did not give a limiting instruction, nor did defense counsel ask for one at that stage or note the failure of the court to give that charge. Nonetheless, after the testimony had concluded, the court stated that it thought a limiting instruction might be appropriate as to why the officers had gone to talk to Rolland in the first place. (1027). Rolland's counsel responded, however, that he did not want such a limiting instruction. (1027-28).

B.   The Defense Case

    1.   Moore's Arrest, Conviction, and Statements

The defense intended to use, as part of its case, the fact that in 1993 Anthony Moore had confessed to having participated in the Radio Shack robbery as a lookout, and had identified three other men -- not including Rolland -- as having committed the robbery and murder. Defense counsel also planned to rely on the fact that Moore had been convicted for his role in the robbery.

Prior to trial, the prosecutor filed a motion in limine, seeking to preclude Rolland from introducing evidence of the arrest and conviction of Moore for the felony-murder of O'Sullivan, the

statements of Moore, and evidence of the arrest of Marvin Brown. (See A 1-8). The State's motion papers recounted that Moore had confessed to being a lookout during the robbery, but that he had denied ever entering the store itself and had insisted that he had been outside when O'Sullivan was shot. As the State conceded, Moore had also inculpated three others -- not Rolland -- in the robbery (A 2-3), and had been convicted for his participation as a lookout in the case. (A 6).[7] However, Moore subsequently told the prosecutor "that he did not participate in the robbery and does not know who did," and he testified to that effect in a November 1998 hearing. (A 3). The prosecutor then argued that Rolland should be precluded from introducing evidence of Moore's conviction, because it was irrelevant since "[w]hat happened to another person arrested has nothing to do with whether this defendant committed the crime." (A 6).

In support of this application, the prosecutor also contended that the pertinent portion of Moore's confession was inadmissible hearsay. According to the State, Moore's statements did not constitute declarations against his penal interest because they did not meet the criteria for that exception to the hearsay rule. (A

---

[7] The prosecutor also acknowledged that Brown had been "identified by two people in the Radio Shack as being one of the robbers. He was also identified by someone outside of the store as possibly someone who fled the store." (A 3).

7). Noting that the first requirement for that exception was that the declarant was unavailable, the prosecutor asserted that Moore was available. He next argued that Moore's statements, insofar as they pertained to Rolland, were not declarations against penal interest -- that is, what Moore had said about who else was involved, even if it exculpated another individual, was not a declaration against <u>Moore's</u> penal interest. (A 7).

During oral argument of the <u>in limine</u> motion, the prosecutor supplied additional details concerning Moore's statements. He represented that Moore had been arrested in 1993 for an unrelated robbery, and that when the police officers asked if he had information concerning any other crimes, Moore mentioned the Radio Shack robbery. (H 199). During the course of the police interviews, Moore first said that he "had been informed by a named individual, Jonathan Jones, that Jones had done it." (<u>Id.</u>). He then gave "varying statements which he said Jones had done it with a guy named Brett, and he ended up identifying Jones, [Brett] Faranoy [phonetic] and Marvin Brown as participants in the robbery . . . He finally made a statement in which he says, 'Okay, I was the lookout.'" (H 199-200). When the police asked Moore to make a videotaped statement, he requested a lawyer; the Assistant District Attorney then instructed the detectives to tell Moore "it's okay that they wish to continue to speak to him about information, but

what he says would not be used against him." (H 200). Moore then continued to make admissions to an assistant district attorney, stating that he was the "lookout with these other people." (H 200). Moore was later tried and convicted based on his "admission that he was the lookout." (H 201).

The prosecutor related that, subsequent to Moore's conviction, he took the stand at Curtis Gibson's trial, where he testified under oath that he had not been involved at all in the Radio Shack crime, not even as a lookout, and "took the Fifth as to questions beyond that." (H 201, 206). Based on his answering the question about whether he had been involved, the trial judge in Gibson's case ruled that Moore was available, that his statements inculpating others were not declarations against his penal interest, and thus that his confession could not be admitted. (H 202-04, A 69-71).

The attorneys at Rolland's trial continued to debate the merits of the *in limine* motion, specifically, whether defense counsel could call Moore and question him about his arrest, conviction, and statements. (207-12). Defense counsel asserted that independent evidence connected Moore and Brown to the crime, specifically, eyewitnesses had identified both men as participants. (213, 218). Counsel also indicated that he wanted to question

Detective Turnbull about Moore's arrest and conviction for the Radio Shack murder and Moore's identification of the men who supposedly had committed the crime with him -- a group that did not include Rolland. (216-17). Counsel explained that he envisioned Turnbull's testimony as undermining the credibility of the police officers, because Turnbull had been involved in the investigation of the case from the beginning, knew about the arrests of Moore and Brown, and thus could explain what had transpired between the murder in 1992 and the police questioning of Rolland in 1997 -- they could "bring this case up to date on why all of a sudden in '97 things are happening." (219). Counsel also stated that he would try to show that the officers were "lying when they put his confession into his mouth. Certainly there are details of his confession, which I'm claiming did not come from Rolland." (221). Counsel also argued that the jury would "wonder why nothing happened in this case until these guys confessed" (225), and that it was inconsistent to permit the State to show how the police had learned about Rolland's involvement in the crime in 1997 without allowing testimony about what happened between 1992 and 1997. (227-28).

The State opposed, arguing that Moore's arrest and conviction were not relevant, and that Moore's statement about what other people had done was inadmissible hearsay. (226). While the court

deferred decision and allowed defense counsel time to do additional research (232-33), the judge indicated that he was inclined to rule against the defense position "as far as Mr. Moore is concerned." (234).

The court did not rule on the _in limine_ motion until after the close of the prosecution's case, at which time defense counsel requested permission to call Moore to the stand and ask him whether he had been a participant in the Radio Shack robbery as a look-out. (755). Assuming that he would invoke his Fifth Amendment right not to testify, defense counsel asserted that his position was that Moore had "no rights to remain silent at this stage of our proceeding" since he could not be put in jeopardy, having already been convicted. (755-56). The prosecutor responded that Moore had testified under oath in a prior proceeding (Gibson's trial) that he had not been involved, and if he invoked the Fifth Amendment at Rolland's trial and was therefore unavailable, his statements would only be declarations against his penal interest to the extent that they inculpated himself, not anyone else. (758). Defense counsel insisted that he should be able to introduce Moore's confession based on Rolland's "absolute right to due process of a trial, including the calling of any witness in his own behalf." (762). The prosecutor repeated his earlier position that the comments were not relevant "for whether this defendant committed the crime," and that

they were declarations against Moore's penal interest only to the extent that he inculpated himself, and that he did so before being told that "what he said would not be used against him." (758, 764).

The court held that the statements that Moore had made after the prosecutor offered him immunity were not against his penal interest, and that Moore's naming Brown was not "inherently reliable" because the case against Brown had been dismissed, and because Moore had recanted his confession. (766-67). Defense counsel pressed the point that Moore's statement contained enough of a description of events to be reliable and that Brown had been identified by an eyewitness. (767-68). The prosecutor responded that the witness who had identified Brown had been mistaken because the fingerprints that had been discovered matched James Davis, not Brown, and that Moore's unreliability was demonstrated because he had never named Davis, even though the fingerprints conclusively showed that Davis had participated in the crime. (769, 772-74).

In any event, at Rolland's request, Moore was called and sworn in as a witness outside the presence of the jury. (784). Defense counsel asked questions concerning whether he had been involved in the Radio Shack robbery, and Moore answered, "I take the Fifth." (786-88). Moore also stated that he would respond the same way to any other questions concerning the robbery. (787). Defense counsel

asserted that if Moore refused to testify, he would become "unavailable" and his prior statements should be admitted as declarations against penal interest: "It is my position, one that I argued before that his statement that he was a lookout with three other persons, none of whom are the defendant, is an admission against his penal interest and also the penal interest of the other three persons, and therefore, would meet the threshold determination of reliability because that's the whole basis of the concept of the admissibility of a declaration against penal interest." (760-61). Counsel also submitted that the statement was Brady material, "evidence of an exculpatory nature," which Rolland had a due-process right to enter into evidence. (762). Defense counsel also asked that if Moore took the Fifth in front of the jury, he be "directed to testify here on the grounds that since he has been convicted, a judgment of conviction has been entered, that he no longer has a right of self-incrimination." (789).

The court finally held that Moore was still subject to criminal liability, entitling him to claim Fifth Amendment immunity. It then denied the defense request to have him called as a witness before the jury. (790).

2.    Rolland's Trial Testimony


        Rolland testified at trial and denied that he had participated
in the robbery. (799-800). He also denied that he had told the
police that he had committed the crime. (865).


        According to Rolland, when the police interviewed him in late
1997, he was serving a six-to-twelve-year sentence for a Bronx
robbery that he had committed with Curtis Gibson, whom he had known
for more than a decade. (797-98, 800, 804, 808, 868, 877). He was
living in a low-to-medium security section of the correctional
facility at the time and was eligible for parole in March 1999.
(804, 809). He related that on October 31, 1997, Detectives Hayes
and Petrak had come to the facility to speak to him about the
circumstances under which his friend Curtis Gibson had been shot.
(881-82). Rolland testified that this was the first time that he
had heard that Gibson had been wounded in a shooting incident years
ago. (885). He also testified that the detectives had told him that
he could "help Gibson out" by writing out a statement about the
shooting, and diagraming it, and he complied. (885). He based the
diagram on what the officers told him and wrote a statement about
the shooting that he did not know to be true. (881, 884-88, 892-
94).

As recounted by Rolland, on November 7, 1997 Detectives Hayes and Petrak returned to talk with him. (811-12). The detectives read him Miranda warnings from a card, and he agreed to speak with them. (813-16). The officers told him to sign the Miranda card, which he did. He also wrote on the card "I was not promised nothing about any deal for time or nothing", but he did so because the detectives had threatened him. (818). The detectives began talking about "a Radio Shack and Gibson being in the Radio Shack and about other things that happened in the Radio Shack." (816). In response to his statement that he did not know anything about the incident, the officers told him that if he did not cooperate, "they would make sure I don't go to the parole board. They also said at that time that they will make sure I go to a facility that's worser than the one I'm in. And they would make sure I don't have no freedom or nothing." (816, 910).

At this point, according to Rolland, he requested a lawyer, but the detectives insisted that they just wanted "to make sure things are clear," and told him that he would not have to go to court and go in front of a judge. (817, 855, 938). As recounted by Rolland, the detectives told him that they wanted him to fill in details about the crime, and "help them with some stuff that they showed [him] that they had written down". (908-09). Rolland claimed that the officers had told him specifically what to write in his statement. (817-20, 833, 908-10, 913, 983-84). Once he finished

writing, the detectives signed the statement and advised him to tell Turnbull "exactly what we explained to you in here so he'll know and he'll be able to straighten it out too." (823-24). Rolland stated he was not afraid of forgetting the details conveyed to him by the detectives about the robbery because they were clear in his mind. (923). When Turnbull came into the room, Rolland agreed with Turnbull's statement that he had been involved in the Radio Shack robbery (823-24, 827-28, 921-22), and answered other questions by admitting his involvement, even though those answers were not truthful. (827-28, 830, 832, 834). Occasionally he also elaborated on details of the crime that the two detectives had provided him. (835, 836).

During this interview, Rolland read Turnbull the statement that he had written for Hayes and Petrak. (825). He testified that he had called Gibson "Butch" and Davis "Kendo" because he had heard Hayes and Petrak refer to them by those nicknames. (825-26, 872). He also stated to Turnbull that he had used a .38 revolver and that Davis had used a Tech Nine, because the detectives had told him to say that (828-29), and that his description about removing the bullet from his arm had also been dictated by the two detectives. (831-32).

Rolland recalled that Turnbull had then left the room, and Hayes and Petrak had returned, complaining that he had not told

Turnbull what they had told him to say. According to Rolland, they threatened him again, then reviewed the details about the robbery, and told him to write a new statement. (837-39). Rolland claimed that this second statement was also untrue. (839).

Detective Ferrari then came into the room and talked to him about a "car that got burned up." (840). He told Ferrari that he had burned a car because that was the information that he had been given by Hayes and Petrak. (841). Ferrari also asked him about a gun, and Rolland told Ferrari that he had sold a gun, because the two detectives had told him to say that as well. (842). Ferrari then instructed him about what information he should include in a written confession. (949-50). In sum, Rolland testified that, other than information that he had made up, his written account of the shooting had been based entirely on information that Hayes and Petrak had given him. (847-51).

After the detectives finished with him, a correction officer told him they were taking him to the special housing unit. (861-64). He "figured something had went wrong, so [he] broke down a little bit" and said to himself, "[t]hese guys must have tricked me or something." (863).

Over defense objection, the court then held that Rolland's previously-suppressed October 31, 1997 statement could be admitted

as a prior inconsistent statement to contradict his testimony that he had first learned from the police that Gibson had been shot in 1992. (879, 881, 1026, 1028).[8] The October 31 statement read as follows:

> Me and Curtis Gibson were hanging out one day between October 6 - December 23 in the parking lot area of the basketball court. We hear gun shots and Curtis told me he was hit, so I took him to the hospital, which one I don't remember at this moment. The hours were 3:45 to 6:30 p.m. in the winter evening. That's all I can remember for now.

(1028 (Ex. 20)).

## D. The Verdict and Sentence

On March 15, 1999, the jury convicted Rolland of second-degree murder. (1267). The judge sentenced him on March 30, 1999 to a prison term of twenty-five years to life. (Sentencing Hearing 26).

## III. Post-Conviction Proceedings

Rolland appealed to the Appellate Division. He argued: (1) that he had been denied his right to present a defense when the trial court precluded evidence of Moore's statements about the Radio Shack robbery; and (2) that the trial court had improperly ruled that Rolland, by alleging that the police had coerced his

---

[8] As noted, this statement had previously been suppressed for failure to provide <u>Miranda</u> warnings. <u>See</u> p.11, n.3, <u>supra</u>.

confession, had opened the door to admitting testimony that Gibson had inculpated Rolland as his accomplice. (A 227-28 (Petr's Appellate Div. Brief at i-ii)).

In June 2001, the Appellate Division unanimously affirmed Rolland's conviction. With regard to Rolland's first claim, it held that the trial court had

> properly exercised its discretion in precluding defendant from introducing an out-of-court statement under a declaration against penal interest theory (see, People v. Settles, 46 NY2d 154, 167-70; People v. Thanh Giap, 273 AD2d 54, lv denied 95 NY2d 872). The declarant claimed to have been a lookout in the instant felony murder, and named three supposed accomplices, none of whom were defendant or either of his two separately convicted codefendants. The court properly found this declaration to be totally unreliable. The declarant's statement, in which he initially denied any personal involvement in the instant crime, was motivated entirely by a desire to obtain lenient treatment for himself in an unrelated case; the declarant later recanted; and the declarant never implicated a person whose guilt was conclusively established through fingerprint evidence as well as that person's confession and guilty plea in this case. The only evidence arguably supporting the reliability of the declaration was that one of the persons named was identified as a perpetrator. However, that identification was clearly established to be mistaken and the charges against that individual were dismissed. Moreover, under all the circumstances, there was no showing that the declarant had competent knowledge of the underlying facts, notwithstanding his unsupported assertion that he was a fourth participant in the crime.

People v. Rolland, 284 A.D.2d 275, 728 N.Y.S.2d 138 (1st Dep't 2001).

With regard to the second claim, the Appellate Division ruled:

> The court properly admitted limited testimony about a nontestifying codefendant's statement inculpating defendant in order to explain what led detectives to interview defendant five years after the crime occurred, since the defense opened the door to admission of the statement by way of its allegations of a police conspiracy (see, People v Simpson, 256 AD2d 205, lv denied 93 NY2d 902; cf., People v. Cruz, 249 Ad2d 136, lv denied 92 NY2d 924).

Id. at 276, 728 N.Y.S.2d at 139.

Rolland's appellate counsel sought leave to appeal to the New York Court of Appeals in two letters, dated July 10, 2000 and August 1, 2001. (A 360-62). In those letters he raised both issues that he had argued before the Appellate Division. The Court of Appeals denied Rolland's leave application on February 6, 2002. See People v. Rolland, 97 N.Y.2d 733, 740 N.Y.S.2d 706 (2002) (Kaye, C.J.).

Petitioner did not seek certiorari from the Supreme Court. Instead, counsel filed a timely habeas petition in this court on October 22, 2002.

IV.  The Federal Proceeding

In support of his petition, Rolland asserts two claims. He first argues that Moore's statement that he was the lookout and acted with three named men was "sufficiently trustworthy" for admission. He bases that contention on the fact that the confession

36

was used against Moore at his trial, and led to a guilty verdict. In addition, he asserts that three eyewitnesses identified Marvin Brown as having been present at the robbery, and that a grand jury returned an indictment against Brown. Given these circumstances, Rolland asserts, the state court's ruling excluding Moore's "corroborated admission against penal interest" denied petitioner his right to present a defense premised on evidence that someone other than he had committed the crime. (Petr's Memo at 32-33, 37-48). In a Reply Memorandum, petitioner also requests an evidentiary hearing to determine the reliability of Moore's statement naming three other accomplices. Seizing on respondent's assertion that "there is no indication that Moore provided any details whatsoever about what had occurred on November 19, 1992" (Resp. Memo at 40), petitioner asks the court "to review Moore's complete written statements which the prosecutor withheld from the trial court." (Reply Memo at 2).

In support of his second claim, Rolland argues that Gibson's statement "did not bear upon the question of whether the detectives coerced appellant to confess and then lied about their tactics." Accordingly, he asserts, the brief testimony of the police officers that Gibson had inculpated Rolland, thus leading them to question Rolland, violated his rights under the Confrontation Clause, as articulated in Bruton v. United States, 391 U.S. 123 (1968), and its progeny. (Petr's Memo at 51-57).

## ANALYSIS

### I. Habeas Standard of Review

The stringency of federal habeas review turns on whether the state courts have passed on the merits of the petitioner's claim, that is, whether the decision of the highest state court to consider the claim is "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001)(discussing 28 U.S.C. § 2254(d)). In Rolland's case, the Appellate Division addressed the substance of both his current claims, holding that the trial court had "properly exercised its discretion in precluding defendant from introducing an out-of-court statement under a declaration against penal interest theory," and that "the court properly admitted limited testimony about a nontestifying codefendant's statement inculpating defendant in order to explain what led detectives to interview defendant five years after the crime occurred." Rolland, 284 A.D.2d at 275-76, 728 N.Y.S.2d at 139-40. In short, the Appellate Division adjudicated Rolland's claims "on the merits." See 28 U.S.C. § 2254(d)(1); Norde v. Keane, 294 F.3d 401, 410 (2d Cir. 2002)(state court decides "claim on the merits when it (1) disposes of the claim on the merits and (2) reduces its disposition to judgment."); Sellan, 261 F.3d at 311.

Once the state court has addressed the merits of the petitioner's habeas claims, he may obtain relief only if the state court's ruling

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). See, e.g., Bell v. Cone, 535 U.S. 685, 693-94 (2002); Williams v. Taylor, 529 U.S. 362, 412-13 (2000); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Brown v. Artuz, 283 F.3d 492, 497-98 (2d Cir. 2002).


Clearly established federal law "refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." Howard, 406 F.3d at 122 (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002)). "A federal court may not grant habeas simply because, in its independent judgment, the 'relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Id. (quoting Fuller v. Gorczyk, 273 F.3d 212, 219 (2d Cir. 2001) (quoting Williams, 529 U.S. at 411)). A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law or if the state court decides a case differently

than th[e Supreme] Court has on a set of materially indistinguishable facts." Id. (quoting Williams, 529 U.S. at 413). As for what constitutes an "unreasonable application" of settled law, the Williams Court observed that "unreasonable" did not mean "incorrect" or "erroneous," id. at 410-11, noting that a writ could issue only "if the state court identifies the correct governing legal principle from this Court's decision [and] unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. As implied by this language, "Some increment of incorrectness beyond error is required . . . [H]owever, . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" Monroe v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006)(quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).

Under the habeas statute, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); McKinney v. Artuz, 326 F.3d 87, 101 (2d Cir. 2003).

II.  The Due-Process Claim

Rolland first claims that the trial court deprived him of his

due-process rights when it barred him from introducing Moore's out-of-court confession as a declaration against penal interest. In support of this argument, he asserts that Moore's statements were sufficiently trustworthy to show that someone other than he had committed the crime.[9] He further suggests that the trial court's ruling, which applied the hearsay rule governing statements against penal interest, was erroneous since Moore's "description of the acts of three other men inside the store, whom he named, was just as self-inculpatory as his admission to being the lookout, and, hence, also reliable." (A 42-43). (See Petr's Memorandum of Law at 32-48).

Petitioner's argument rests on two related, though arguably distinct, rights under the Due Process Clause. One is the general right to a fundamentally fair trial, which may be implicated when a state trial court makes an evidentiary ruling that fails to comply with governing state law, and that error leads to the exclusion of evidence that is sufficiently important to call into question the reliability of the verdict. See, e.g., Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004); Wade v. Mantello, 333 F.3d

---

[9] In arguing for the reliability of that confession, petitioner notes that some eyewitnesses identified Marvin Brown, whom Moore had named; that the prosecutor had mentioned that there had been "some eyewitness identification that would connect" Moore to the crime (A 85); and that the State had found Moore's statement that he had been involved in the crime sufficiently reliable to use it against him at his own trial. (A 32-33, 42).

51, 59-60 (2d Cir. 2003). The other is the defendant's right to present a defense, a principle that may be violated if the challenged ruling, even though arguably consistent with state law, unjustifiably prevented the petitioner from presenting evidence of such consequence that its exclusion eliminated a reasonable doubt that would otherwise have been suggested by the evidentiary record. See, e.g., Howard, 406 F.3d at 132 (quoting United States v. Agurs, 427 U.S. 97, 112 (1976)).[10]

In assessing petitioner's arguments, we must keep in mind that a federal habeas court is limited to a determination of whether a state court's evidentiary ruling involved an error of constitutional magnitude. See Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.") (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)). Accordingly, a petitioner seeking habeas relief on the basis of allegedly erroneous evidentiary rulings must establish that the trial court's errors "deprived [him] of a fundamentally fair trial." Zarvela, 364 F.3d at 418 (quoting Rosario v. Kuhlman, 839 F.2d 918, 925 (2d Cir. 1988)). Erroneously excluded evidence reaches this level of

_____

[10] A holding of constitutional error in the face of a state court's arguably correct application of state law may reflect that the state-law principle either was inherently unreasonable or else was unreasonable in its application to the facts of the specific case. See, e.g., Chambers v. Mississippi, 410 U.S. 284, 297-98 (1973). Cf. Dutton v. Evans, 400 U.S. 74, 86 (1970).

unfairness if it "creates a reasonable doubt that did not otherwise exist." Jones v. Stinson, 229 F.3d 112, 120 (2d Cir. 2000) (quoting Agurs, 427 U.S. at 112).

While a criminal defendant "has the right . . . to present his own witnesses to establish a defense," Washington v. Texas, 388 U.S. 14, 19 (1967); see also Chambers, 410 U.S. at 294 ("[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations"), at the same time "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410 (1988). Under the Constitution, states have broad latitude to establish rules subjecting a defendant's right to present relevant evidence to "reasonable restrictions", United States v. Scheffer, 523 U.S. 303, 308 (1998), designed to "assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers, 410 U.S. at 302. As a result, the Supreme Court is "traditionally reluctant to impose constitutional restraints" on "ordinary evidentiary rulings by state trial courts" concerning the admissibility of evidence. Wade, 333 F.3d at 60 (quoting Crane v. Kentucky, 476 U.S. 683, 689 (1986)). "Restrictions on a defendant's presentation of evidence are constitutional if they serve 'legitimate interests in the

criminal trial process,' and are not 'arbitrary or disproportionate to the purposes they are designed to serve.'" United States v. Almonte, 956 F.2d 27, 30 (2d Cir. 1992) (quoting Rock v. Arkansas, 483 U.S. 44, 55-56 (1987)). Accord, e.g., Zarvela, 364 F.3d at 418 (quoting Wade, 333 F.3d at 88). The exclusion of evidence is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." Scheffer, 523 U.S. at 308.

As an initial matter, we consider whether the state court violated the pertinent state evidentiary rule. See Wade, 333 F.3d at 59 n.7 (courts should first consider the propriety of the state court's evidentiary ruling before considering constitutional error); Washington v. Schriver, 255 F.3d 45, 57 (2d Cir. 2001) (a court must examine the stated reasons for the exclusion of evidence and "'inquire into possible state evidentiary law errors' that may have deprived the petitioner of a fair trial") (quoting Jones, 229 F.3d at 120).

At the time of Rolland's conviction, under New York law an out-of-court declaration could be admitted as a statement against the declarant's penal interest only if the following conditions were met:

> (1) the declarant must be unavailable to give testimony, whether by reason of absence from the jurisdiction,

44

> refusal to testify on constitutional grounds, or death;
> (2) the declarant must have been aware at the time of its
> making that the statement was contrary to his penal
> interest; (3) the declarant must have competent knowledge
> of the underlying facts; and (4) there must be sufficient
> competent evidence independent of its declaration to
> assure its trustworthiness and reliability.

People v. Thomas, 68 N.Y.2d 194, 197, 507 N.Y.S.2d 973, 975

(1986).[11] Even if these criteria are satisfied, the decision whether

to admit such a statement rests within the trial court's sound

discretion. See id. at 198, 507 N.Y.S.2d at 975. Indeed, the

hearsay exception for declarations against penal interest, which

was "first accepted in [New York] in 1970," has been "embraced

cautiously" because the courts have recognized that admissions of

guilt "may in fact be among the most disserving of declarations"

and hence "[t]he interest compromised must be of sufficient

magnitude or consequence to the declarant to all but rule out any

motive to falsify; . . . ." Id. Consistent with this concern,

"within practical limitations, only the portion of the statement

opposed to declarant's interest should be admitted." Id.

---

[11] In People v. Hardy, 4 N.Y.3d 192, 791 N.Y.S.2d 513
(2005), the New York Court of Appeals overruled Thomas by
limiting the admissibility of hearsay statements against an
individual's penal interest, based on the Supreme Court's holding
in Crawford v. Washington, 541 U.S. 36 (2004). See Hardy 4 N.Y.3d
at 197, 791 N.Y.S.2d at 516-17. This recent change in the law
does not affect petitioner's case both because it narrowed the
admissibility of such evidence and because Crawford -- and
presumptively Hardy -- do not apply to habeas petitions in which
the state appellate process ended before Crawford was decided.
See Mungo v. Duncan, 393 F.3d 327, 335 (2d Cir. 2004).

There is no dispute that the first prong of the _Thomas_ test was satisfied in this case. Once Moore invoked his Fifth Amendment protections, he was "unavailable" as a witness in Rolland's trial. See _California v. Green_, 399 U.S. 149, 168 n.17 (1970); _People v. Settles_, 46 N.Y.2d 154, 167, 412 N.Y.S.2d 874, 882 (1978). Respondent disputes, however, whether any of the other _Thomas_ prongs were met, and we conclude that the state courts' rejection of this hearsay exception in Rolland's case is unassailable.

We first consider the very fundamental question whether the statements at issue were contrary to Moore's penal interest. In assessing this issue, we start by noting that Moore's confession actually consisted of three somewhat inconsistent statements. Moore's first statement to the police was that he "had been informed" that three men, Jonathan Jones, Brett Faranoy, and Marvin Brown, had committed the Radio Shack robbery and that the source of this information was Jones. (199, 214-15). Upon further questioning, Moore changed his story, stating that he knew about the crime because he had been the lookout during the robbery. (200, 214-15). In the third statement, made after the supervising prosecutor had told him that his statement "would not be used against him," Moore asserted that he had been the lookout for the three men he had named earlier. (200, 214). Respondent argues that, of these three separate statements, the first did not implicate

46

Moore, the second one was actually in his self-interest -- made to minimize his criminal conduct in order to convince authorities that he was guilty only as a minor player -- and the third was made only after he had received an assurance that what he said would not be used against him. (Resp's Memo at 38-39).

This analysis is substantially correct. The only portion of Moore's confession that was pertinent to Rolland's defense was Moore's identification of the three other men who had purportedly participated in the robbery. That statement is not, in itself, self-inculpatory. Indeed, Moore first identified these men without even hinting that he had also been involved. Although he subsequently described himself as the lookout -- an admission presumably designed to add to the credibility of the identification -- his separate acknowledgment of his participation is the only portion of his various statements that was arguably against his penal interest. Moreover, his final linkage of himself and the three other men was made only after he had been promised that the prosecutor would not use his statements against him.

Under New York law, this hearsay exception requires the court to limit the admission of an out-of-court declaration to those segments that are truly self-inculpatory. The court "should admit only the portion of that statement which is opposed to the

declarant's interest since the guarantee of reliability contained in declarations against penal interest exists only to the extent the statement is disserving to the declarant." <u>People v. Brensic</u>, 70 N.Y.2d 9, 16, 517 N.Y.S.2d 120, 123 (1987). A declarant's identification of other individuals as participants does not constitute such a statement against interest, and hence is not properly admitted. <u>Id.</u> at 22, 517 N.Y.S.2d at 127.

Indeed, the very same principle applies under the federal rule governing the admission of statements against penal interest. As the Supreme Court noted in <u>Williamson v. United States</u>, 512 U.S. 594 (1994), a statement admitting one's criminal responsibility carries with it some indicia of reliability. <u>Id.</u> at 599.[12] That assumption of reliability does not extend to other portions of a declaration that is, in part, self-inculpatory:

> The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix a falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.

<u>Id.</u> at 599-600. Applying this caution, the Supreme Court read the federal rule as not allowing "admission of non-self-inculpatory

---

[12] "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." <u>Id.</u>

statements, even if they are made within a narrative that is generally self-inculpatory." Id. at 601. In terms particularly pertinent here, the Court cautioned:

> The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement inculpates someone else. "[T]he arrest statements of a co-defendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a co-defendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence."

Id. at 600-01 (quoting Lee v. Illinois, 476 U.S. 530, 541 (1986)(brackets in Williamson). See also Bruton, 390 U.S. at 136.

That caution especially applies here. At the time of his declaration, Moore was in custody on other charges and plainly offered his identification of the three Radio Shack robbers to improve his own situation. Moreover, whatever may have been Moore's motivation to implicate Brown, Faranoy and Jones, he first named them without in any way implicating himself; indeed, he attributed the information to Jones. He then made a significantly inconsistent statement by identifying himself as involved, but in doing so he described his role as significantly attenuated -- he was only a lookout and hence not responsible for the shooting. Having made these statement, Moore then eventually recanted his statements. (767). In short, his accusation against the three other men bore

49

the classic hallmarks of unreliability and cannot be considered a statement against his penal interest.

Under the circumstances, the trial court's exclusion of Moore's statements about the three other men was plainly also proper because they do not meet the Thomas requirements that the declarant "have competent knowledge of the facts" and that there exists an independent basis for finding that the out-of-court statements were reliable. In this respect it bears emphasis that although Moore was convicted on the basis of his admission and that charges were filed against one of the men he had identified –– Marvin Brown –– Moore later recanted and his conviction was vacated (167), and the charges against Brown were dismissed before trial. (766-67, 771-72). Moreover, three other men –– Gibson, Davis and Rolland –– later each admitted involvement in the crime and identified each other as fellow participants, and those admissions received significant corroboration when Davis's fingerprints were matched with prints found at the scene, thus confirming his presence there even though Moore had never named him. (771-74). The collective weight of all of these circumstances amply justified the trial judge in finding that there was not a "high probability" that Moore's statements were "truthful." Brensic, 70 N.Y.2d at 14, 517 N.Y.S.2d at 122. The Appellate Division affirmed these findings, Rolland, 284 A.D.2d at 276, 728 N.Y.S.2d 139, and we see no basis

for questioning their validity, much less clear and convincing evidence that the state court's pertinent factual findings were erroneous.

The trial court's ruling on this issue is also fully consistent with other New York caselaw. Thus, for example, in Brensic, a defendant's shifting versions of events and his later recantation were elements that the Court of Appeals pointed to as supporting its conclusion that a challenged confession was unreliable as a matter of law. Id. at 20-21. Similarly, in People v. Giap, 273 A.D.2d 54, 54-55, 709 N.Y.S.2d 62, 63 (1st Dep't 2000), the Appellate Division found that the declarant's subsequent recantation of his declaration, together with other deficiencies, was a proper reason for the trial court to reject the alleged confession. Compare People v. Fonfrias, 204 A.D.2d 736, 612 N.Y.S.2d 421 (2d Dep't 1994)(declarant's confession "demonstrated a first-hand knowledge of the specific facts of the murder"). See also Green v. Georgia, 442 U.S. 95, 97 (1979)(holding that hearsay was reliable because evidence corroborating the confession was "ample").

In resisting this conclusion, Rolland offers a potpourri of arguments to the effect that Moore's statements were sufficiently reliable to justify admission. None persuades.

Rolland asserts that "three eyewitnesses had connected Marvin Brown to the crime", and that this provided sufficient indicia of reliability. (Petr's Memo at 44). In this connection he cites Settles, in which the Court of Appeals, in illustrating the kind of evidence that might provide a sufficient indication of reliability, noted that "eyewitness testimony placing [someone other than defendant] at or near the scene of the crime . . . would suffice." 46 N.Y.2d at 169, 412 N.Y.S.2d at 884. Settles, however, is plainly distinguishable.

In this case, although several people apparently identified Brown as a participant in the robbery, the trial court was clearly justified in rejecting the reliability of Moore's identification of Brown as a perpetrator. Moore recanted and the charges against Brown -- based on Moore's statements -- were dropped once Gibson, Davis, and Rolland confessed to the crime. Moreover, the eyewitness who was apparently the most positive about Brown's presence -- Mr. Bostany -- had described Brown as touching the toy cars at the store, but fingerprint analysis identified Davis as the man at the spot where Bostany had supposedly seen Brown. This discovery and Davis's subsequent guilty plea (768-69) plainly undercut the reliability of Bostany's identification.

Rolland further claims that Moore's statements were reliable

because the prosecutor had noted that there was "eyewitness evidence connecting Anthony Moore to the crime," and because "the State considered Anthony Moore's statement sufficiently reliable to use it against him at his own trial." (Petr's Brief at 42). These arguments are equally meritless as bases to show that the trial court's exclusion of Moore's statement was improper.

It is true that Moore was convicted based on his statement that he had acted as the lookout. Nonetheless, years later Gibson's cellmate sent the letter to the District Attorney's Office that outlined Gibson's role in the crime, and the investigation turned to Gibson, Davis, and Rolland, all of whom confessed, implicated each other and were indicted, and as a result the prosecutor "'invited' Moore to move to vacate that judgment." (Resp's Brief at 42). Although Rolland submits that "vacating a conviction is not the same thing as an acquittal on the merits" (Pet's Memo at 42), in this context that is a distinction without a difference, as the State's acknowledgment that Moore's conviction should be vacated completely undercuts Rolland's argument that Moore's confession was reliable because it had been used to convict him.

The circumstances here are entirely different from those outlined in Green v. Georgia, 442 U.S. 95 (1979), on which Rolland also relies. In that case "the State considered [a defendant's

statement against interest] sufficiently reliable to use it against
[the defendant] and to base a sentence of death upon it." <u>Id.</u> at
97. In approving the use of that statement against another
defendant, the Supreme Court in <u>Green</u> found that there was "ample"
evidence corroborating the defendant's confession. <u>Id.</u> Here, in
contrast, the State recognized its error in relying on Moore's
statement to convict him and promoted the vacatur of that
conviction.

Petitioner further argues that the preclusion of Moore's
statement from his trial, after it had been introduced in Moore's
trial, amounted to an "'unjustified and uneven application of
evidentiary standards'". (Petr's Memo at 44) (citing <u>Dumas v.
Strange</u>, 2002 WL 1608280, *10 (D. Conn. July 3, 2002)). This too is
wide of the mark.

Moore's statement that he had been a lookout was received at
his own trial as an admission, and that use of the statement did
not require Moore's trial court to assess its reliability. The
proposed role of Moore's confession in Rolland's trial was quite
different. Rolland did not care so much that Moore may have
admitted that he was a lookout; what he wanted to use was the
second part of Moore's declaration -- that three people other than
Rolland had been involved -- and the trial court was obliged to

weigh the reliability of that assertion in determining its admissibility. Moreover, as we have noted, that particular statement, seen in the light of the  information developed long after Moore's prosecution, was plainly not reliable.

In sum, as the Appellate Division held, the trial court did not abuse its discretion under New York law in ruling that Moore's statements failed to satisfy the reliability criteria identified in Thomas, and in excluding that statement. In short, the ruling in question was fully consistent with New York law.

It is equally apparent that the state court's ruling did not transgress any independent constitutional requirement. As the Second Circuit recently noted, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged or otherwise inadmissible; and his right may yield to rules and procedures of the adversary process that 'provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case.'" Howard, 406 F.3d at 131-32 (quoting Taylor, 484 U.S. at 410-11).

The ruling in Rolland's case was entirely consistent with due process since it excluded only a statement justifiably found to be wholly unreliable, and hence the hearsay principles applied cannot

be said to "'be arbitrary or disproportionate to the purposes they are designed to serve.'" Id. at 132 (quoting Rock, 483 U.S. at 55-56 ). Accord, e.g., Chambers, 410 U.S. at 302 (court may require defendant to "comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.").

Not surprisingly, the standards governing the admission of statements against penal interest in New York parallel those applied in the federal courts. Rule 804(b)(3) of the Federal Rules of Evidence excepts from the general hearsay rule (Rule 802) "[a] statement which at the time of its making . . . so far tended to subject the declarant to . . . criminal liability, . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." The rule further provides that such a statement "is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

As we have noted, the Supreme Court has specifically held that when a suspect admits his participation in a crime and then names other participants, the portion of the statement identifying the other individuals is not contrary to the declarant's penal interest and hence not ordinarily admissible under this hearsay rule. See,

e.g., _Williamson_, 512 U.S. at 602-04. Furthermore, to be admissible under Rule 804(b)(3), the statement must be made spontaneously and in close temporal proximity to the crime and must be corroborated by some other evidence in the case. See, e.g., _Chambers_, 410 U.S. at 300-01. In the absence of adequate corroboration, such a statement is deemed inadmissible. See, e.g., _United States v. Beltempo_, 675 F.2d 472, 479 (2d Cir. 1982).

Thus, under federal law Moore's statements would also have been excluded. They were not corroborated by other evidence in the case; in particular, the eyewitness identification upon which Rolland relied was shown to be unreliable. In addition, his statements were made two months after the crime, following Moore's arrest on another charge, and were neither spontaneous nor made in temporal proximity to the Radio Shack robbery. Finally, and most crucially, Moore's statements concerning Jones, Brown, and Faranoy were not against his own penal interest. See, e.g., _Williamson_, 512 U.S. at 602-04.

Aside from all the other deficiencies in petitioner's argument on this point, we note that trial judges are afforded considerable discretion in assessing the reliability of hearsay statements offered under a penal-interest exception, see, e.g., _United States v. Jackson_, 335 F.3d 170, 179 (2d Cir. 2003); _United States v._

Harwood, 998 F.2d 91, 92 (2d Cir. 1993); People v. Shortridge, 65 N.Y.2d 309, 315, 491 N.Y.S.2d 298, 302 (1985), and deference to their judgment is particularly appropriate on federal habeas review. See Estelle, 502 U.S. at 71-73 (recognizing that a state court's erroneous application of state evidentiary law rarely rises to the level of a federal constitutional violation). Accordingly, we conclude that in this case, where there was no abuse of discretion by the trial judge, the state courts did not unreasonably apply established Supreme Court precedent precluding "arbitrary or disproportionate" restrictions on Rolland's presentation of evidence, and therefore habeas relief is not available.


### III. Petitioner's Request for an Evidentiary Hearing


In an effort to resuscitate his due-process claim, Rolland argues in the alternative that this court should conduct an evidentiary hearing to determine the reliability of Moore's statement. (Petr's Reply Memo at 1-4). For reasons already noted, even if the statement were deemed to have independent indicia of reliability, it would not meet the hearsay exception at issue since the pertinent part of Moore's confession was not contrary to his penal interest. In any event, petitioner can demonstrate no basis for a hearing at this stage.

The habeas statute authorizes a federal court hearing only if (1) the claim relies on (a) a new rule of constitutional law made retroactive to cases on habeas review or (b) a factual predicate that could not have been previously discovered with the exercise of due diligence, and (2) the facts underlying the claim would establish by clear and convincing evidence that, but for the constitutional error, no reasonable factfinder would find the petitioner guilty of the offense. 28 U.S.C. § 2254(e)(2). "A petitioner who 'failed to develop the factual basis of a claim in State Court proceedings' is ordinarily barred from seeking an evidentiary hearing in federal court." <u>Shiwlochan v. Portuondo</u>, 345 F. Supp.2d 242, 257 (E.D.N.Y. 2004)(quoting 28 U.S.C. § 2254(e)(2)).

Rolland's claim does not rest on a newly recognized legal theory or on the existence of newly discovered evidence. He equally fails to show that he ever alleged sufficient facts in state court to require a hearing there. Finally, he proffers no factual basis even now for deeming Moore's identification of other robbers to have sufficient indicia of reliability to compel its admission as a constitutional matter. In short, there is no basis to conduct an evidentiary hearing at this stage.

IV.   The Confrontation-Clause Claim

Rolland's second claim is that the trial court's ruling allowing two police detectives to mention that Curtis Gibson had identified Rolland as one of the perpetrators violated petitioner's rights under the Confrontation Clause. In substance, he asserts that the challenged trial-court ruling and its affirmance by the Appellate Division reflected an unreasonable interpretation of clearly-established Supreme Court law, as defined in Bruton v. United States, 391 U.S. 123 (1968), and Cruz v. New York, 481 U.S. 186 (1987). (Petr's Memo at 49).

Specifically, Rolland faults the trial court for allowing Detectives Turnbull and Hayes to refer in passing to the fact that Gibson had inculpated petitioner, as they described the events that led to their interviewing Rolland and eliciting his various confessions.[13] The trial court allowed this reference to Gibson's

_____

[13] The pertinent colloquy between the prosecutor and Detective Turnbull was as follows:

Q. Detective Turnbull, were you aware in February of 1997 that there had been a latent fingerprint on a motorized car left at Radio Shack on November 19th of '92?
A. Yes, I was.
Q. And as of February of '97 had that print been identified?
A. No sir, it had not.
Q. Now, after you received the information about Gibson, was he interviewed?
A. Yes, he was interviewed.

statement based on its finding that petitioner had "opened the door" to such evidence because defense counsel had asserted during <u>voir</u> <u>dire</u> that the police had conspired to frame Rolland by coercing his confession and were lying at trial to cover up their unlawful interrogation. (469, A 35).

Rolland argues that Gibson's identification of him "did not bear upon the question of whether the detectives coerced appellant to confess and then lied about their tactics." (Petr's Memo at 50). In substance, petitioner asserts that his trial attorney's strategy of challenging the <u>bona</u> <u>fides</u> of Rolland's confession by suggesting

---

```
     Q. And did he inculpate himself?
     A. Yes, he did.
     Q. And did he inculpate anyone else?
     A. Yes, he did.
     Q. And who are the people who he inculpated?
     A. Mr. James Davis and a Mr. Robert Rolland.
     Q. Did you provide those names to latent fingerprint?
     A. Yes sir, I did.
     Q. Did you interview James Davis?
     A. Yes sir, I did.
     Q. And after Davis was interviewed was there a plan made
  to interview this defendant, Robert Rolland?
     A. Yes, there was.
```

(424-25). The questioning then focused on the police interviews of Rolland.

When Detective Hayes was questioned, he was asked about his participation in the interviewing of Rolland, but before that he was asked: "Were you present when Curtis Gibson inculpated this defendant, Robert Rolland, in connection with Radio Shack?", and he responded "Yes, I was." (557). The examination then proceeded to focus on his participation in the subsequent questioning of Rolland.

that the police had conspired to frame him should not have been deemed to open the door to evidence that the police had been led to Rolland by Gibson.

The traditional rule governing assessment of claims under the Confrontation Clause derives from Ohio v. Roberts, 448 U.S. 56 (1980), in which the Supreme Court held that an out-of-court declaration by an unavailable witness inculpating the defendant may be received for the truth of the statement only if it is found to be reliable. Under Roberts, reliability could be established either through "a showing of particularized guarantees of trustworthiness" or from the fact that the evidence fell "within a firmly rooted hearsay exception." Id. at 66. The Supreme Court has recently overruled Roberts, and held that out-of-court statements by a non-testifying declarant that are of a "testimonial" nature -- a category that includes unsworn declarations made to police officers -- "may not be received against the accused to establish the truth of what was stated unless (I) the declarant is unavailable to testify at the trial, and (ii) the accused was afforded a prior opportunity to cross-examine the declarant on the statement." Mungo v. Duncan, 393 F.3d 327, 332 (2d Cir. 2004) (citing Crawford, 541 U.S. at 53-54). Crawford, however, is not retroactively applied on collateral review, see Mungo, 393 F.3d at 335, and since Rolland's conviction became final long before Crawford was decided, Crawford

is irrelevant here. We accordingly take the contours of his Sixth Amendment rights as of the date when his conviction became final.

Ultimately, petitioner's claim must fail regardless of whether Roberts or Crawford is applied. We start by noting that, under both Roberts and Crawford, the Confrontation Clause addresses the introduction of out-of-court declarations only when they are offered to prove the truth of the assertions contained in the declarations. See, e.g., Tennessee v. Street, 471 U.S. 409, 413-14 (1985); United States v. Logan, 419 F.3d 172, 177-78 (2d Cir. 2005); Ryan v. Miller, 303 F.3d 231, 252-53 (2d Cir. 2002). See also Mungo, 393 F.3d at 332. This distinction parallels the categorization found in traditional hearsay rules, see, e.g., Ryan, 303 F.3d at 252-53 (assessing applicability of "background exception" in response to Confrontation Clause claim), which define hearsay as "a statement made out of court, . . . if it is offered for the truth of the fact asserted in the statement." People v. Romero, 78 N.Y.2d 355, 361, 575 N.Y.S.2d 802, 804 (1991)(quoting Richardson, Evidence § 200 at 176 [Prince 10th ed.]). Accord Fed. R. Evid. 801(c). If the statement in question is offered, not for its truth, but for some other purpose –- for example, to explain actions taken as a result of the statement or to show, where needed, how an investigation developed –- it does not violate either the hearsay rules or the Confrontation Clause. See, e.g.,

Street, 471 U.S. at 413-14; Logan, 419 F.3d at 177-78; People v. Felder, 37 N.Y.2d 779, 780-81, 375 N.Y.S.2d 98, 98 (1975).

One common scenario "in which the admission of testimony as background evidence may be appropriate" is "as 'appropriate rebuttal to initiatives launched by the defendant.'" Ryan, 303 F.3d at 253 (quoting United States v. Reyes, 18 F.3d 65, 70 (2d Cir. 1994), and citing United States v. Gilliam, 994 F.2d 97, 103 (2d Cir. 1993) (finding that hearsay testimony, offered to rebut defense questioning, was permissible because "The statement about the second gun was admitted . . . under the theory that it was not offered to prove the truth of the matter asserted, but only to explain the actions of the police officers in returning to the scene."). That was the case in Rolland's trial.

The trial court's decision to allow Detectives Turnbull and Hayes to mention that they had focused on Rolland because Gibson had inculpated him was explicitly intended to allow the State to rebut the accusation by petitioner's counsel that the police had conspired to frame his client. In short, the stated purpose of the ruling was to provide context for the police interviews of Rolland, and thus to provide the jurors information relevant to their assessment of the police witnesses's credibility in testifying that Rolland had made his confessions without coercion or coaching.

Thus, the introduction of the testimony was not intended to prove the truth of Gibson's statement, but rather to allow the prosecutor to respond to Rolland's contention that he had been targeted without basis and, apparently, for nefarious purposes.

The limited purpose of the testimony was repeatedly made explicit during the course of extended colloquy between counsel and the court prior to the court's decision to permit a brief reference to Gibson's statement. Indeed, Rolland's trial attorney at one point conceded the propriety of such a ruling but argued extensively that, in response to the introduction of the testimony, he should be permitted, if he chose, to explore the reliability of Gibson's statement (469, A 35) –– a position that the trial judge understandably rejected in view of the limited role of the testimony about Gibson's statement.

It further bears emphasis that the trial judge indicated his willingness to give the jury a limiting instruction specifying that the testimony in question was being offered for reasons other than to prove the truth of Gibson's statement. (179, A 46). Although no such instruction was given, we note that Rolland's attorney did not ask for one at the time of the testimony and furthermore declined a later offer by the court to provide such an instruction. (416-17, 423, 1027-28). We further note that, given the context in which the

testimony was received -- during narrative by Detectives Turnbull and Hayes of their contacts with various people while investigating the crime -- the jury was likely to understand, even without an instruction, that the detective's brief reference to what Gibson had said to the police was intended (1) to explain why the detectives had next decided to contact Rolland and (2) to demonstrate that the police had not simply arbitrarily (or for other unstated improper reasons) decided to target Rolland five years after the commission of the crime.

In pressing his claim, petitioner relies principally on the Second Circuit's decision in <u>Ryan</u>, 303 F.3d at 247-53. The analysis in <u>Ryan</u>, however, does not save Rolland's claim.

In that case the police were investigating the murder of a young boy, and focused on a number of teenagers. At one point the police questioned Ryan, apparently simply as a witness, and he offered an alibi for the others as well as himself. <u>Id.</u> at 235. At the same time, the police were interviewing another teenager who was a suspect -- Peter Quartararo -- and he, in a series of inconsistent statements, implicated Ryan and the others and then confessed to his own involvement. <u>Id.</u> at 236-37. Quartararo's confession was subsequently found in related prosecutions of him and of several of the other boys to have been coerced and obtained

in violation of <u>Miranda</u> and state law, and to be unreliable and hence inadmissible. <u>Id.</u> at 237.[14]

At Ryan's trial the prosecutor offered testimony by the police that they had initially interviewed Ryan as a potential witness, and had also spoken at the same time to Peter Quartararo, and that, as a result of what Quartararo had told them, they had promptly informed Ryan of what Quartararo had said, gave him his <u>Miranda</u> warnings and charged him with murder. <u>Id.</u> at 240. The police witnesses also testified that, after being told what Quartararo said, Ryan made another statement, which was partly self-inculpatory and clearly inconsistent with his alibi. <u>Id.</u> at 243. In summation, the prosecutor then emphasized the sequence of events, arguing in substance that Quartararo's statement (the exact contents of which were not testified to at trial) had disclosed the real facts and triggered Ryan's admissions. <u>Id.</u> at 244.

The Second Circuit held that receipt of this testimony had violated Ryan's rights under the Confrontation Clause. In so holding, the Court first observed that the introduction of accusations of guilt against a defendant by an out-of-court

---

[14] One of those decisions was <u>People v. Brensic</u>, 70 N.Y.2d at 20, 517 N.Y.S.2d at 125, cited above for the proposition that unreliable out-of-court statements, even if partly against the declarant's penal interest, are inadmissible under the hearsay rules of New York. <u>See</u> pp. 47-51, <u>supra</u>.

declarant was ordinarily precluded under the principles governing the outcome in Bruton. Id. at 247. The Court further noted that although the police witnesses had not explicitly described what Quatararo had told the police, their testimony and the prosecutor's summation had made very clear that Quartararo had implicated Ryan in the murder. Id. at 249-50.

In finding this use of the absent declarant's accusation to be problematic under the Confrontation Clause, the Court emphasized that the out-of-court statements by Quartararo had been repeatedly found by a series of courts to have been coerced, obtained in violation of federal and state law, unreliable and inadmissible. These findings in themselves precluded the invocation of the reliability exception recognized by Roberts and its progeny. Id. at 247-48.

The Court then turned to the question of whether the admission of the declaration might be protected as coming within the exception for evidence intended simply to explain the course of the investigation -- the rationale that had been adopted by the state courts and by the district court that initially heard Ryan's habeas petition. Ryan, 303 F.3d at 250-51. In rejecting this analysis, the Court of Appeals held that there had been no need in that case to demonstrate the course of the investigation preceding Ryan's

admission, and it emphasized, in substance, that Ryan had not affirmatively argued any point to which this information would have been a reasonable response. As the Court observed, "[t]he testimony was not necessary or relevant to a material issue in the case –– it did not offer an explanation for something about which the jury would be curious." Id. at 253. The Court further noted that, even if relevant, the statement by Quartararo should not have been admitted because, in view of prior judicial findings as to its unreliability, its admission was highly prejudicial and lacked any meaningful probative weight. Id.

This analysis does not apply here. First, the testimony challenged here involved only a brief reference to the fact that Gibson had inculpated Rolland, and that reference appeared in a context in which it was plain that the only use being made of it was to explain why the police had proceeded to interview Rolland. Second, the prosecutor made no other use of this point, either during the trial, and thus did not at all imply to the jurors that they should look to Gibson's identification of Rolland as independent proof of Rolland's guilt.[15] Third, the statement by Gibson, although not necessarily sufficiently reliable to have

---

[15] The prosecutor referred only in passing during summation to the fact that Gibson had inculpated Rolland (1182), but in contrast to the prosecutor in Ryan, he did not suggest that Gibson's statement should be taken as evidence of Rolland's guilt

justified its introduction for its truth under <u>Roberts</u>[16], most assuredly did not constitute a coerced and otherwise illegally obtained admission, as was the case with Quartararo's statements. Finally, and most importantly, Rolland did press a contention before the jury that called into question the <u>bona fides</u> of the police investigators' decision to target him, especially so long after the commission of the crime.   In short, this case presents the typical scenario in which an out-of-court statement may be received, not for its truth, but to explain why the police took certain actions the validity of which were being challenged by defense counsel. <u>See</u> <u>e.g.</u>, <u>Reyes</u>, 18 F.3d at 70 & n.3; <u>Gilliam</u>, 994 F.2d at 103; <u>People v. Simpson</u>, 256 A.D.2d 205, 206, 682 N.Y.S.2d 376, 377 (1st Dept. 1998).

In reaching this conclusion, we note that petitioner appears also to argue that even if Gibson's out-of-court declaration was admitted for a limited purpose that was not related to the truthfulness of the statement, his rights were violated because that use of the statement was not really necessary to respond to

---

[16] For reasons noted, portions of a statement by a suspect that inculpate others – as distinguished from the portions that implicate himself –- are ordinarily treated as of questionable reliability. <u>See</u> pp. 47-49, <u>supra</u>. Nonetheless, in this case, we note that Gibson's statement was subsequently borne out by, among other things, (1) the confession of Davis, (2) the confession of Rolland, (3) the fingerprint evidence linking Davis to the crime scene, and (4) the medical records showing that Gibson had been treated that day for a gunshot wound.

defense counsel's arguments to the jury. (Petr's Memo at 55). Whether or not that be the case, petitioner points to no Supreme Court authority -- and we are aware of none -- that would apply the Confrontation Clause to evidentiary rulings admitting out-of-court statements for an otherwise proper purpose, based solely on the contention that the evidence was not necessary to the State's response to a defense argument. Indeed, in Ryan the Second Circuit looked to whether the challenged evidence was "necessary or relevant" and then emphasized the disjunctive nature of the test by explaining that the determinative question was whether the testimony "offered an explanation for something about which the jury would be curious." Id. at 253 (emphasis added). In view of both defense counsel's accusations of police misconduct in allegedly framing Rolland and doing so by inventing the key elements of his confession for no discernible reason, the jury would surely have been "curious" -- and indeed very properly interested to know -- why the police had initiated their questioning of Rolland and whether they had invented his detailed admissions out of whole cloth.[17]

Finally, we note that in assessing the application of the so-

_____

[17] It bears mention that Rolland's own testimony about the police invention of the details of his statements raised the same issues as his attorney's arguments prior to trial, although that testimony followed the police witnesses' reference to Gibson's inculpation of him.

called "background exception" to the hearsay rule (and by implication to the Confrontation Clause), the Second Circuit in Ryan quoted at length the multi-factor criteria summarized in its prior decision in Reyes, 18 F.3d at 70. See Ryan, 303 F.3d at 253.[18] Although those criteria encompass a multitude of considerations, Ryan focused only on whether the out-of-court statement was "necessary or relevant to a material issue in the case", id., a limitation that was not surprising since that question proved dispositive of the Confrontation Clause issue that it was

---

[18] The "guidance" from Reyes that was quoted in Ryan concerned the determination of relevance and the balancing of prejudice and probative value required by Fed. R. Evid. 401 and 403, and consisted of the following:

Questions involved in the determination of relevance and importance of such evidence include: (i) Does the background or state of mind evidence contribute to the proof of the defendant's guilt? (ii) If so, how important is it to the jury's understanding of the issues? (iii) Can the needed explanation of background or state of mind be adequately communicated by other less prejudicial evidence or by instructions? (iv) Has the defendant engaged in a tactic that justifiably opens the door to such evidence to avoid prejudice to the Government?
Questions involved in the assessment of potential prejudice include: (v) Does the declaration address an important disputed issue in the trial? (vi) Was the statement made by a knowledgeable declarant so that it is likely to be credited by the jury? (vii) Will the declarant testify at trial, thus rendering him available for cross-examination? If so, will he testify to the same effect as the out-of-court statement? Is the out-of-court statement admissible in any event as a prior consistent, or inconsistent, statement? (viii) Can curative or limiting instructions effectively protect against misuse or prejudice?

Ryan, 303 F.3d at 253 (quoting Reyes, 18 F.3d at 70-71).

addressing.

In choosing not to address all of the _Reyes_ criteria here, we rely in part upon the fact that _Reyes_ was not purporting to determine the standards for Confrontation Clause analysis, and in any event its listing of criteria has not been adopted by the Supreme Court as the basis for such a constitutional analysis. Thus, even if the state courts failed to follow this approach, that would not constitute a decision that was either contrary to, or an unreasonable application of, Supreme Court decisional law. In any event, one of the criteria that the court must look to under _Reyes_ is whether the defendant has opened the door to the challenged testimony -- the very issue addressed in _Ryan_ -- and in this case, for the reasons noted, the state courts were plainly justified in so concluding.

In sum, the state-court ruling on the admission of Gibson's inculpation of Rolland through the police testimony cannot be deemed to be contrary to, or an unreasonable application of, settled Supreme Court law. Hence, habeas relief may not issue. 28 U.S.C. § 2254(d)(1).

## **CONCLUSION**

For the reasons noted, we recommend that the writ be denied and the petition dismissed with prejudice.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable George B. Daniels, Room 410, 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985), reh'g denied, 474 U.S. 1111 (1986); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**DATED: New York, New York**
      **February 6, 2006**


                              **RESPECTFULLY SUBMITTED,**


                              _____

                              **MICHAEL H. DOLINGER**
                              **UNITED STATES MAGISTRATE JUDGE**


Copies of the foregoing Report and Recommendation have been mailed
this date to:

Robert S. Dean
Center for Appellate Litigation
74 Trinity Place - 11th Floor
New York, New York 10006

Mark Dwyer, Esq.
Assistant District Attorney
   for New York County
One Hogan Place
New York, New York 10013